**ACTION OUTDOOR ADVERTISING JV, L.L.C., Plaintiff,**

v.

**TOWN OF CINCO BAYOU, Florida, Defendant.**

**No. 3:03CV483/LAC.**

United States District Court, N.D. Florida, Pensacola Division.

March 22, 2005.

E. Adam Webb, Atlanta, GA, for Plaintiff.

Holly A. Dincman, Tallahassee, FL, for Defendant.

## ORDER ON SUMMARY JUDGMENT

COLLIER, Senior District Judge.

Pending before the Court are motions for summary judgment filed by Plaintiff[1] (docs. 47, 50–51) and Defendant (docs. 44–46) in this case. Plaintiff has filed responses (doc. 56) to Defendant's motion, and Defendant has likewise responded (docs. 57) to Plaintiff's motion. Both parties have filed numerous supplemental materials as well. The Court has taken summary judgment under advisement (doc. 53) and is now prepared to rule on the mo-

---

1. Plaintiff moves only for partial summary judgment as the matter of the amount of damages and attorney fees was reserved.

tions. For the reasons stated below, Defendant's' motion for summary judgment is granted and Plaintiff's is denied.

## I. BACKGROUND

The facts of this case are free from any substantial dispute. The Defendant Town of Cinco Bayou describes itself as

a very small coastal town founded in 1950 and located in Okaloosa County, Florida. The Town is approximately 1/2 square mile in area, has a population of 386 people (according to the 1990 census) [and estimated currently at around 500], and has three (3) full-time employees—the Town Manager/Clerk, Assistant Town Manager/Clerk, and Town Maintenance worker—as well as service contracts with an Attorney, Engineer, and a community law enforcement officer. The Town Council consists of six (6) elected officials—four (4) council members, the mayor, and the mayor pro tempore.

Doc. 45 at ¶ 1; doc. 48, ex. 1, Nell Webb Affid. at ¶¶ 4–5. Cinco Bayou has a Town Charter and a Code of Ordinances which were adapted from earlier ordinances and codified in 1996. The Code has a provision which specifically prohibits "signs commonly known as billboards." Doc. 48, ex. 27 at § 82–101; ex. 28 at § 94–115(12).[2]

Plaintiff Action Outdoor Advertising is in the business of securing locations for the construction of and operation of billboard signs. This ordinarily involves obtaining a long-term ground lease or purchasing an easement on a given piece of property. Action Outdoor then rents the billboards for advertising. On July 1, 2003, Action Outdoor filed two sign permit applications with Cinco Bayou, for signs to be located on two separate properties owned by a convenience store chain.

Each of the proposed signs would have a billboard "face" consisting of rotating triangular shaped strips which "flip" periodically, thus allowing each billboard "face" to display up to three advertisements. Each proposed sign could hold six advertisements. Action Outdoor estimated that it would charge $1,000 per month, per advertising face and that each proposed sign could therefore generate approximately $6,000 per month if operating at full capacity. Both of the applications contained a Ground Lease Agreement executed by Action Outdoor and the property owner for a term of twenty years, with a fifteen year renewal option for Action Outdoor. The leases require Action Outdoor to pay the lessor $100 per year until the sign is built. After the sign is erected, the lessor is paid anywhere from $7,200 to $9,600 per year. At the time of the permit applications, Action Outdoor did not have clients or tenants in place for the two proposed sign locations.

On July 11, 2003, ten days after the application was filed, Steve Galberaith of Action Outdoor sent Town Manager Nell Webb a letter inquiring about the status of the applications. On July 21, 2003, Webb replied, stating that Cinco Bayou has a very small staff and that the applications would be processed "in the most expeditious manner." Doc. 48, ex. 5. On July 29, 2003, Webb sent two letters to Action Outdoor denying each permit because of the prohibition against billboards in Sections 82–101 and 94–115 of the code, but also

---

2. Section 82–101 defines an "off-premises signs" as:

a sign structure which advertises or directs to an establishment, business, merchandise[,] service, commodity, attraction or entertainment sold, produced, manufactured or furnished at a place other than the property on which the sign is located or to a political candidate or political issue.... This sign includes but is not limited to those types of signs commonly known as billboards.

Doc. 48, ex. 27 at § 82–101.

because the 35 foot height of the proposed signs violated height restrictions and the contractor for the signs was not properly licensed. Doc. 48, ex. 7.

Two days later, Galberaith telephoned Webb asking about the appeals process for the denial of the sign applications and was told that he would need to appeal in writing to the Town Council within thirty days of receipt of the denial letters. Doc. 48, ex. 1, Webb affid. at ¶ 14; doc. 48, ex. 7. On August 21, 2003, Galberaith sent Webb a letter amending the two sign permit applications to include a licensed sign contractor. Webb responded by letter on August 27, 2003, noting that while the amended applications named a licensed sign contractor, this change alone did not cause the applications to be in full compliance with the Code. Doc. 48, ex. 13. Galberaith then filed an appeal on August 28, 2003, and asked to be placed on the agenda for the September 11, 2003 Town Council meeting. Although the hearing was originally scheduled for that day, on September 9, 2003, Mayor Norm Frucci sent a letter to Action Outdoor stating that, because Webb was unable to attend, the hearing would be continued until the next scheduled Town Council meeting on October 9, 2003. Doc. 48, ex. 16. However, the hearing was again rescheduled for an earlier time at "a scheduled special Council meeting on September 25, 2003." Doc. 48, ex. 17. The appeal hearing was held as scheduled, and during it Galberaith acknowledged that the intent of the appeal was essentially to attack on the ordinance against billboards. Doc. 48, ex. 18. The Town Council affirmed the denial of the permits.

Action Outdoor filed this lawsuit on October 20, 2003. Cinco Bayou was served on November 13, 2003, doc. 6, and filed a motion to dismiss on December 18, 2003, which dealt with Rule 8 issues and moved for dismissal of a couple of the numerous claims. Doc. 7. On May, 10, 2004, the Court entered an order partially granting the motion without prejudice to Action Outdoor's right to file an amended complaint, which it did. Docs. 20, 21. In the meantime, discovery had commenced, and the parties submitted their joint report on the Rule 26(f) planning meeting on February 17, 2004. Doc. 13. Both motions for summary judgment were filed on August 23, 2004.

The attorney for Cinco Bayou, C. Jeffrey McInnis, represents that, shortly after Action Outdoor had filed its initial sign applications, he began gathering materials for the drafting of a new sign ordinance and began drafting the new ordinance "as early as August, 2003." Doc. 48, ex. 30, McInnis affid. at ¶ 4. A draft had been completed on September 3, 2003 and a reading and public hearing on the draft was held on that day.[3] Upon McInnis's recommendation that counsel with greater experience in constitutional law and sign ordinances be retained to review the new ordinance, Cinco Bayou hired Mark Miller, an attorney from Lakeland, Florida, to redraft the ordinance. Doc. 48, ex. 30, McInnis affid. at ¶ 8. On April 8, 2004, Ordinance No. 200, was enacted, repealing and replacing the old sign ordinance in its entirety. Doc. 48, ex. 30, McInnis affid. at ¶ 9; ex. 29. Both McInnis and Webb represent that Cinco Bayou has no intention of ever reenacting the old sign ordinance. Doc. 48, ex. 1 at ¶ 35; ex. 30, McInnis affid. at ¶ 10.

In its amended complaint, Plaintiff advances the following claims that the old sign provisions, now repealed, are unconstitutional:

1. The sign restrictions favor commercial over noncommercial speech;

---

3. The hearing was advertised in the *Northwest Florida Daily News. See* doc. 48, ex. 33.

2. The sign permit requirements lack necessary procedural safeguards relating to the permit process, particularly with respect the need for definite time limits for City officials to administrate the permitting process;

3. Town officials are granted a virtually limitless discretion by the ordinance to decide whether permission will be granted or denied to post a sign;

4. The sign restrictions impermissibly regulate the content of noncommercial speech;

5 The ordinance restricts or prohibits far more speech than could be justified by its stated purposes or any other legitimate governmental objectives;

6. The ordinance permits government officials to regulate both commercial and noncommercial signs but includes no substantial governmental purpose for doing so and provides no stated rationale or purpose to support its restrictions;

7. The ordinance "places a tremendous burden on the ability of citizens and property holders in the Town to communicate commercial or noncommercial messages using even the most fundamental methods of communication, such as yard signs, flags, and banners, ... leav[ing] virtually no avenue by which citizens can speak freely;"

8. The ordinance impermissibly favors certain types of commercial speech "while prohibiting other legal and truthful commercial information;"

9. The ordinance favors the speech of certain groups and organizations over others, violating equal protection;

10. The ordinance favors signs and displays of recognized religious orders and organizations in violation of the Establishment Clause of the First Amendment.

11. The ordinance threatens those who defy the ordinance with criminal and civil liability without providing a fair opportunity to know what conduct will incur such liability due to the vagueness of the provisions;

12. The denial of the instant permit applications violated "due process, equal protection and freedom of speech" because the permits should have been granted as per certain ordinance provisions allowing additional signs on certain types of properties;

13. The ordinance favors signs displaying content regarding the business on the premises over "off-premises" or noncommercial messages; and

14. The ordinance is unconstitutional on it face, overbroad in its application, and chills the right of free speech via the medium of signs.

## II. Motion for Summary Judgment

### A. STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]he substantive law will identify which facts are material" and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of fact is material if it is a legal element of the claim under the applicable substantive law which

might affect the outcome of the case. *See id.*

At the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. *See id.* at 249, 106 S.Ct. at 2510–11. A genuine issue exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *See id.* "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.*, 750 F.2d 838, 841 (11th Cir.1985)).

## B. DISCUSSION

### 1. MOOTNESS

 Among the arguments made in Cinco Bayou's summary judgment motion, it asserts that this case is mooted by the fact that it has since adopted a new ordinance completely replacing the old one. Because mootness impacts the jurisdiction of the Court, it is a threshold issue in this case. *See Seay Outdoor Advertising, Inc. v. City of Mary Esther, Fla.*, 397 F.3d 943, 946 (11th Cir.2005). The voluntary cessation of allegedly illegal conduct does not render this case moot unless it can be shown that "(1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* at 947 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)). "However, governmental entities and officials have been given considerably more leeway

than private parties in the presumption that they are unlikely to resume illegal activities." *Id.* (quoting *Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.3d 1320, 1328–29 (11th Cir.2004)). Thus, "[c]onstitutional challenges to statutes are routinely found moot when a statute is amended or repealed ... unless there is some reason to believe that the law may be reenacted after dismissal of the suit." *Id.* (quoting *City of Sunrise*, 371 F.3d at 1329). "Indeed ... the cases are legion from this and other courts where the repeal of an allegedly unconstitutional statute was sufficient to moot litigation challenging the statute." *National Advertising Co. v. City Of Miami*, 402 F.3d 1329, 1333–34, 2005 WL 637197 at *3 (11th Cir.2005) [hereinafter "*National Advertising* "].

 The Eleventh Circuit's decision in *Seay* reversed this Court's finding against mootness in a case quite similar to the one at bar.[4] In that case, the plaintiff sign company sued the defendant city alleging numerous constitutional violations in its sign code. Before suit was filed, however, the city amended the sign code in order to remedy the perceived constitutional infirmities. Because the city acted promptly after it had received the permit applications, and because counsel for the city expressly represented that there was no intention of re-enacting the old ordinance, the Eleventh Circuit found the voluntary cessation doctrine did not preclude a finding of mootness. *Seay*, 397 F.3d at 948. In so holding, the court cited *City of Sunrise*, a nearly identical case in which the defendant city also amended its sign code, eliminating most of the implicated provisions, before suit was commenced and represented that it would not defend the old

---

4. Because of these similarities, the Court draws heavily upon the *Seay* decision in ana-

lyzing this case.

code. *Id.* Moreover, in *City of Sunrise,* the court warned that

> if the City of Sunrise did somehow nurture the intention of reinstating the old, purportedly unconstitutional Sign Code, and actually adopted the Amended Sign Code as a temporary measure whenever another lawsuit appeared on the horizon, we would plainly forbid it from doing so. In *Jews for Jesus [v. Hillsborough County Aviation Authority* ], 162 F.3d [627,] 630 [ (11th Cir.1998) ], we specifically warned against the possibility of this kind of "flip-flopping."

371 F.3d at 1331; *see also National Advertising,* 402 F.3d at 1334, 2005 WL 637197 at *5 (noting that "the courthouse door would remain open for reinstatement of ... suit" in the event of such "flip-flopping").

The court in *City of Sunrise* distinguished the holding in *National Advertising Co. v. City of Ft. Lauderdale,* 934 F.2d 283 (11th Cir.1991) [hereinafter "*National I* "] which applied the voluntary cessation doctrine to deny a mootness argument because the city in that case did not amend its code until six weeks after it had been sued and moved to dismiss the case on mootness grounds the very next day. 371 F.3d at 1332. The court, "undoubtedly informed by the timing of the change in the law," found there to be a "not-insubstantial chance" that the old ordinance would later be reenacted. *Id.* Thus, the city's actions were deemed to have been made in bad faith, and the court concluded that there was a "reasonable expectation" that re-enactment of the ordinance would occur. *Id.* at 1332–33.

Action Outdoor contends that the instant case is more in line with *National I* than with *Seay* and *City of Sunrise.* It points to the fact that it was not six weeks but six months since this lawsuit was filed when Cinco Bayou amended its ordinance. While this factor should inform the Court's

decision, it does not alone show that there is a substantial chance that the old ordinance would be reenacted. In fact, every other factor countermands the timing factor. *See National Advertising,* 402 F.3d at 1333, 2005 WL 637197 at n. 6 (noting that, while the defendant city amended its sign code six months after being sued, "other evidence persuades us that [the city] did not amend its sign code to deprive this Court of jurisdiction"). First, Cinco Bayou may not have immediately passed an amended code into law, but its response to Action Outdoor's permit applications was immediate. Indeed, even before the permit appeals process was final, a draft of the new ordinance was presented at a public hearing. Although much delay ensued, this was at least partly owing to Cinco Bayou's recognition of the weighty constitutional issues that were involved, and it should also be noted that, being a rather small town, there were very few personnel available to administrate this task. It is therefore evident that, while Cinco Bayou's *actions* may have been deliberate, its *intentions* were expeditious and, more importantly, formed very early in the timeline of events. Second, while in *National I* the city moved to dismiss on mootness grounds the very day after it amended its sign code, which strongly indicated that the amended code was effected simply to establish mootness, in the instant case there was no such apparent motive. In fact, when the new ordinance went into effect, Cinco Bayou had already filed a motion to dismiss on other grounds and discovery was in progress. Only four months later when the instant summary judgment motion was filed was the mootness issue raised. Third, as was present in *Seay* and *City of Sunrise* and absent in *National I,* here there was a clear expression by Cinco Bayou that it has no intention of reverting to the old sign code. Finally, as the court in *City of Sunrise*

stated, should Cinco Bayou decide to re-enact the old code, that would likely be conclusive evidence of bad faith.

Therefore, the Court finds this case to be in alignment with *Seay* and *City of Sunrise,* and accordingly the doctrine of voluntary cessation does not apply to prevent a finding of mootness.

## 2. VESTED RIGHT

■ Action Outdoor contends that this action should not be deemed moot because its right to the sign permits vested at the time the applications were submitted. To claim a vested right under Florida law, Action Outdoor must show either: "(1) that it has reasonably and detrimentally relied on existing law (equitable estoppel); or (2) that [Cinco Bayou] has acted in a clear display of bad faith." *Seay,* 397 F.3d at 948 (citing *City of Sunrise,* 371 F.3d at 1334). A vested right is not easily created since it must "so completely and definitely belong[ ] to a person that it cannot be impaired or taken away without the person's consent." *City of Sunrise,* 371 F.3d at 1333 (quoting *Black's Law Dictionary* (7th ed.1999)).

To establish equitable estoppel, Action Outdoor must show that "it has incurred substantial expense in reasonable reliance on existing law." *Seay,* 397 F.3d at 948 (citing *City of Sunrise,* 371 F.3d at 1338). Action Outdoor does not contend that it has made any significant expenditures in reasonable reliance on the old ordinance, nor can it since the ordinance clearly prohibits the construction of billboards. *See id.*

Rather, Action Outdoor asserts under the second prong of the standard that Cinco Bayou acted in bad faith and in the main cites an unpublished Eleventh Circuit opinion in *National v. City of Ft. Lauderdale,* 8 F.3d 36 (11th Cir.Oct.26, 1993) (*per curiam* ) (table) [hereinafter *"National II* "], which was a second appeal of the

same case as *National I.* Drawing on the facts of that case, the court in *National II* stated that where a municipality denies a permit based upon a then-existing unconstitutional law, the permit applicant is denied a "fair chance" to rely on the law existing at the time of the application. *See* doc. 50, ex. J at 7–8; *see also City of Sunrise,* 371 F.3d at 1338 (citing *National II* ). Consequently, the court held that, despite the fact that a new, constitutionally sound law is subsequently passed, the applicant's right to issuance of the permit under the old law is vested. *Id.*

However, two factors distinguish *National II.* First, the sign company in *National II* was entitled to the permit under the old ordinance because the old ordinance was found unconstitutional in its entirety and therefore deemed a nullity. *Id.* at 10. This was owing to the fact that, for reasons not explained, the specific billboard provision in the old code was not found to be severable, and the issue of severability was not raised on appeal. *Id.* at 3 & n. 2. In the case at bar, severability is in issue and, as will be discussed in the next section, the billboard provision was indeed severable from the old sign code. Thus, in the instant case the old ordinance is not a nullity, and furthermore the new sign code retains the very billboard provision under which Action Outdoor's permits were denied. *See Seay,* 397 F.3d at 949 (noting that, where the new ordinance kept the same billboard provision under which the sign permits were denied, there was no vested right to the permits because "the allegedly unconstitutional aspects of the Repealed Sign Ordinance had nothing whatsoever to do with the rejection of [the] permit applications").

Second, in *City of Sunrise* the Eleventh Circuit specifically noted that *National II* involved a "very different set of circumstances" in which the defendant city dem-

onstrated bad faith in the timing of its amendment of the sign ordinance "in a last-ditch effort to avoid granting· [the] permit." 371 F.3d at 1337, 1340. Thus, the reason a vested right was found in National II without the need to show detrimental reliance was the presence of bad faith on the part of the city. *Id.* at 1340. As the court elaborated in *Seay:*

> Examples of [bad faith] situations include "an 'emergency ordinance' passed while the application was pending," "selective and erroneous enforcement of an arguably unconstitutional provision of the law," and "deliberate delay of the issuance of a permit until after a building moratorium went into effect." [*City of Sunrise,* 371 F.3d] at 1337–38. None of these scenarios, or anything akin to them, is present in this case. First, because there are no off-site billboards in [the city], Seay cannot claim that [the city] selectively enforced its Repealed Sign Ordinance against Seay. Second, the circumstances surrounding the city's amendment to the allegedly unconstitutional Repealed Sign Ordinance are virtually identical to those in *City of Sunrise,* where no evidence of bad faith was found.

397 F.3d at 949. Likewise, nothing akin to these described situations is present in the instant case, and, as discussed in the previous section, this case aligns with *Seay* in that no bad faith is found in Cinco Bayou's amendment of its ordinance. Accordingly, this Court finds no basis upon which to find Action Outdoor has a vested right to issuance of the permits.

## 3. NEW ORDINANCE AND SEVERABILITY

Finally, "the case may still be justiciable if the New Sign Ordinance contains the same constitutional defects as its predecessor. '[A] superseding statute or regulation moots a case only to the extent that it removes the challenged features of the prior law.'" *Seay,* 397 F.3d at 949. The court in *Seay* went on to state:

> Upon review of the New Sign Ordinance, we believe that Seay's challenges to the Repealed Sign Ordinance are moot because they seem to have been remedied by the New Sign Ordinance. However, if the challenged provisions of the New Sign Ordinance are severable from those portions of the Repealed Sign Ordinance that actually caused the denial of the permit application, there is no point in evaluating Seay's arguments as to those provisions. *City of Sunrise,* 371 F.3d at 1347.
>
> . . . . .
>
> "Indeed, if we were to evaluate the validity of certain provisions of the [New Sign Ordinance], knowing that the result of this inquiry could have no effect on the result in this case, our pronouncements would be essentially advisory in nature." [*City of Sunrise,* 371 F.3d at 1347.]

*Id.* at 949, 951. Therefore, should the provision prohibiting billboards be severable in this manner, this case is moot.

■ As a matter of state law,

When part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken. According to Florida law, then, the unconstitutional part of a challenged statute should be excised, leaving the rest intact and in force, when doing

so does not defeat the purpose of the statute and leaves in place a law that is complete.

*Id.* at 949–50 (citations and quotations omitted).

Furthermore, a legislatively expressed preference for severability of unconstitutional provisions is persuasive under Florida law as it would otherwise "seriously infringe on the notion of legislative autonomy . . . ." *Id.* at 950 (quoting *City of Sunrise,* 371 F.3d at 1349).

On the facts before it, the Eleventh Circuit in *Seay* went on to hold that the denial of the sign applications was based on the billboard provision of the old ordinance, which was carried over into the new ordinance and never challenged by Seay. *Id.* The court further found that, "[t]o the extent that any purportedly unconstitutional provisions of the Repealed Sign Ordinance were retained in the New Sign Ordinance . . . the ban on billboards . . . continues to further the purpose of the New Sign Ordinance in the absence of the challenged provisions." *Id.* Accordingly, because the regulatory purpose of the billboard provisions—avoiding eyesores and traffic disruption—would not be destroyed even if any of the allegedly suspect provisions needed to be excised, those provisions were severable. *Id.*

As in *Seay,* in the case at bar, the new sign ordinance appears to have remedied the alleged unconstitutional infirmities in the old provisions. More importantly, however, the "off-premises signs" provision in the old ordinance has essentially been carried over into the new ordinance. *See* doc. 48, ex. 29 at § 4–83–1 and 5. Because Cinco Bayou's long-standing endeavor [5] to regulate this type of sign would continue to further the purpose of the new ordinance even if any of Action Outdoor's constitutional arguments were to prevail as to any of its provisions, those provisions are severable. This is especially pertinent given that, as in *Seay,* Action Outdoor poses no constitutional challenge to the "off-premises signs" provision, the provision under which its sign permits were denied. *Seay,* 397 F.3d at 950. Since Cinco Bayou's clearly evident intent to prohibit billboards would remain even if other sign regulations were to fail, and since Cinco Bayou has distinctly expressed its intent to sever out any unconstitutional provisions from its ordinance, *see* doc. 48, ex. 29 at § 7, this Court finds severability without the need to resolve whether the challenged provisions are indeed unconstitutional. *See Seay,* 397 F.3d at 950–51. Accordingly, this final hurdle to a finding of mootness is cleared.

### III. SUMMARY

Because the constitutional challenges to the old ordinance are moot, this case must be dismissed for lack of subject matter jurisdiction. The Court's ruling in this matter may therefore be summarized as follows, and **IT IS HEREBY ORDERED:**

1. Plaintiff's motion for summary judgment (doc. 47) is **DENIED.**

2. Defendant's motion for summary judgment (docs. 44) is **GRANTED.**

3. Consistent with this order, the Clerk of Court is directed to enter summary judgment in favor of the Defendant TOWN OF CINCO BAYOU, FLORIDA. Plaintiff shall take nothing further by this action and goes without day.

---

5. *See* doc. 45 at ¶ 36 (reviewing Cinco Bayou's historical ordinances prohibiting billboards for purposes of safety and aesthetics).