[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13572
_____

D.C. Docket No. 0:12-cv-60460-WJZ

A.R.,
by and through her next friend, Susan Root,
C.V.,
by and through his next friends, Michael and Johnette Wahlquist,
M.D.,
by and through her next friend, Pamela DeCambra,
C.M.,
by and through his next friend, Norine Mitchell,
T.H.,
by and through her next friend, Paolo Annino,
A.G.,
by and through his next friend Gamal Gasser,

Plaintiffs - Appellants,

B.M.,
by and through his next friend, Kayla Moore, et al.,

Plaintiffs,

versus

SECRETARY FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION,
in her official capacity,
STATE SURGEON GENERAL,
in his official capacity as the State Surgeon General and Secretary of the Florida
Department of Health,
KRISTINA WIGGINS,
in her official capacity as Deputy Secretary of the Florida Department of Health
and Director of Children's Medical Services,
STATE SURGEON GENERAL JOHN ARMSTRONG, MD,
DEPUTY SECRETARY DR. CELESTE PHILIP,
INTERIM SECRETARY JUSTIN M. SENIOR,
Agency for Health Care Administration,
CASSANDRA G. PASLEY,
Director of Children's Medical Services,

Defendants - Appellees,

eQHEALTH SOLUTIONS, INC.,
a Louisiana non-profit corporation, et al.,

Defendants.

_____

UNITED STATES OF AMERICA,

Consol Plaintiff,

versus

THE STATE OF FLORIDA,

Consol Defendant.

2

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 17, 2019)

Before JILL PRYOR, BRANCH and BOGGS,[*] Circuit Judges.

PER CURIAM:

Six plaintiffs appeal the district court's dismissal of a putative class action challenging Florida's provision of medical services to Medicaid-recipient, medically fragile children. In dismissing the case in its entirety, the district court ruled that the State had unambiguously terminated its use of the challenged policy—application of the "convenience standard" in assessing whether private-duty nursing treatment was medically necessary—rendering the case moot, and that no remaining plaintiff had standing to challenge the State's administration of its Pre-Admission Screening and Resident Review program.

After careful consideration and with the benefit of oral argument, we agree with the district court and therefore affirm.

_____

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

## I.    BACKGROUND

This case concerns medically fragile children—children with medical conditions so serious as to require medical apparatus or procedures to sustain their lives.[1] Each of the plaintiffs-appellants is medically fragile. For example, appellant M.D. has cerebral palsy and Strider Syndrome. Unable to swallow, she risks suffocation unless her body is positioned properly at all times. Another appellant, C.V., has Hurler's Syndrome and cannot breathe without a tracheotomy tube—which must be cleaned every five minutes. A third appellant, C.M., has chromosome deletion syndrome, chronic respiratory failure, and severe cerebral palsy. His more than 25 medications must be administered every two hours.

M.D., C.V., C.M., and other medically fragile children sought private-duty nursing ("PDN") services for their gravely needed, specialized, and intensive medical care. PDN services are one-on-one nursing services provided to

---

[1] At the time this suit was initiated, Florida law defined "medically fragile" as referring to a person who is:

> medically complex and whose medical condition is of such a nature that he is technologically dependent, requiring medical apparatus or procedures to sustain life, e.g., requires total parenteral nutrition (TPN), is ventilator dependant, [sic] or is dependent on a heightened level of medical supervision to sustain life, and without such services is likely to expire without warning.

Fla. Admin. Code R. 59G-1.010(165) (2012). Florida's Administrative Code no longer contains this definition. *See* Fla. Admin. Code R. 59G-1.010 (2019).

individuals who require more in-depth care than a hospital or nursing facility can provide. *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1234 (11th Cir. 2011).

Florida's Medicaid program covers medically necessary PDN services provided to Medicaid-recipient children. But at the time the medically fragile plaintiffs sought these services, four Florida policies allegedly reduced coverage of PDN services for them. The first was Florida's definition of "medically necessary," which excluded from coverage services that were "primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider." Fla. Admin. Code R. 59G-1.010(166) (2012); Florida Agency for Health Care Administration's ("AHCA") Home Health Services Coverage and Limitations Handbook (December 2011) ("Handbook") at 2-2.[2] That provision was known as the "convenience standard." Doc. 237 at 6.[3] The State construed the convenience standard to mean that if a child's parents were available to provide nursing services to the child, then PDN services were merely for the convenience of the caretaker and would not be covered by Medicaid. Second, Florida Medicaid covered PDN services only for children who were "unable to attend a Pediatric Prescribed Extended Care" ("PPEC") Center: an institution in which children received out-of-

---

[2] The Handbook is incorporated by reference into the AHCA's rules, *see* Fla. Admin Code R. 59G-4.130 (2011), and therefore has the force of law.

[3] All citations in the form "Doc. #" refer to numbered entries on the district court docket.

5

home care for up to twelve hours a day, seven days a week. Handbook at 2-19. Third, if authorized, Florida PDN services to medically fragile children were "decreased over time as parents and caregivers [were] taught skills to care for their child and [became] capable of safely providing that care or as the child's condition improves." Handbook at 2-23. Fourth, Florida inconsistently administered Pre-Admission Screening and Resident Review ("PASRR") screenings—used to diagnose mental illness or intellectual disability in incoming nursing facility patients, determine whether patients require specialized services, and prescribe those necessary services, 42 U.S.C. § 1396r(b)(3)(F)—resulting in denial of medically necessary services, including PDN care.

Applying these policies, the State routinely denied PDN services to medically fragile children. Without the in-home nursing care the children needed, their families had no choice but to place them in nursing facilities, a result their families desperately sought to avoid.

Two groups of medically fragile children, through their legal guardians, sued Florida officials seeking systemic changes to the State's administration of Medicaid services to such children. The first group, children who were institutionalized—that is, residing in Florida nursing homes—alleged that the State had inappropriately screened them for, and denied them Medicaid coverage for, services that would have allowed them to remain in their homes. The second

group, children who remained at home and received Medicaid-funded PDN services, alleged that the State's policies, including application of the convenience standard, reduced the availability of those services and put them at risk of unnecessary institutionalization.  The plaintiffs sought certification of a class of "[a]ll current and future Medicaid recipients in Florida under the age of 21, who are (1) institutionalized in nursing facilities, or (2) medically complex or fragile and at risk of institutionalization in nursing facilities."  Doc. 95 at 1.

After the district court consolidated their cases, the plaintiffs filed an amended complaint ("complaint") with five counts.  Counts 1 through 4 challenged Florida's "policies, practices, and regulations to reduce [PDN] services."  Doc. 62 ¶ 19.  Counts 1 and 2 specifically alleged violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12165, and the Rehabilitation Act, 29 U.S.C. § 794, respectively.  Under these counts, the plaintiffs alleged that Florida's policies—including the convenience standard, the PPEC preference, the caregiver preference, and improper PASRR screenings—violated each Act by placing them at risk of segregation in institutional settings and by denying them medically necessary services, including PDN services.

Counts 3 and 4 alleged claims under 42 U.S.C. § 1983 for violations of the United States Medicaid Act ("Medicaid Act"), 42 U.S.C. §§ 1396-1396w-5.[4] Specifically, the plaintiffs alleged in Count 3 that the AHCA's regulatory definition of "medical necessity" and the defendants' policies for "providing [PDN services], below the level that is medically necessary, violate[d] the [Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT")] provisions of the federal Medicaid statute."  Doc. 61 at ¶¶ 321-322.  And Count 4 alleged that Florida's policies limited the provision of PDN services, resulting in delays and denials of medically necessary care to the plaintiffs in violation of the Medicaid Act's "reasonable promptness" provision, 42 U.S.C. § 1396a(a)(8), which requires assistance to be provided with reasonable promptness to eligible individuals.

Finally, Count 5 challenged the State's administration of the PASRR provisions of the Nursing Home Reform Amendments of 1987 ("NHRA") to the Medicaid Act, 42 U.S.C. § 1396r.  This claim—brought only by the "institutionalized Plaintiffs," *see* Doc. 62 at ¶¶ 329, 335—alleged that Florida's administration of its PASRR program failed to comply with the NHRA, resulting in wrongful admission of children to, or retention of children in, nursing facilities.

---

[4] The alleged constitutional basis for the § 1983 claim was that the AHCA's definition of "medical necessity" in Rule 59G-1.010(166) was preempted by federal law and invalid pursuant to the Supremacy Clause of the United States Constitution.  U.S. Const. art. VI, § 2.

8

The plaintiffs sought certification of a class under Federal Rule of Civil Procedure 23(b)(2) and for declaratory and injunctive relief on all five claims.

After a year of litigation, including discovery, the State moved to dismiss the complaint because, beginning in 2013, it had discontinued its application of the convenience standard to PDN services. The district court denied the motion to dismiss for two reasons. First, even though Florida had formally changed its policy prioritizing PPEC over PDN services and implemented new policies regarding PASRR screenings, those rule changes were not yet final. Second, Florida had not amended its definition of "medical necessity" in Rule 59g-1.010(166)—that is, the definition that applies generally to all Medicaid services—which contained the convenience standard and which the State allegedly applied when considering whether to cover PDN services.

Another year passed, and the administrative rule changes concerning the PPEC prioritization and PASRR screenings became final. Again, the State moved to dismiss. Because the State still had not amended its regulatory definition of "medically necessary" in Rule 59G-1.010(166), however, the district court denied its motion for a second time.

The district court subsequently dismissed the claims of one of the plaintiffs, A.R., when she moved to Colorado, and of two other plaintiffs, T.H. and A.G., when they turned 21, on the ground that as legal adults they were no longer subject

to the challenged policies.  The district court next dismissed Count 5, concluding that the challenge to the PASRR screenings concerned only institutionalized children and that, due to death or dismissal, no institutionalized children remained as parties to the case.  The district court also denied the plaintiffs' motion for class certification because the proposed class was inadequately defined and unascertainable and because class certification was unnecessary.  Thus, the case was reduced from five to four claims and from a potential class action to only three plaintiffs, none of whom was institutionalized.

Florida then moved for summary judgment, again arguing that the remaining claims—Counts 1 through 4—were moot given Florida's new, final Rule 59G-4.261(4).  The new rule provided that the convenience standard contained in the general definition of "medical necessity" in Rule 59G-1.010(166) "'shall not be applicable when determining the medical necessity of [PDN] services.'"  Doc. 588 at 12 (quoting Fla. Admin. Code R. 59G-4.261(4)).  The State also pointed out that it had been more than three years since it had last applied the convenience standard in deciding whether to cover PDN services.

Treating Florida's motion for summary judgment as a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss, a magistrate judge determined that the case was moot because the State had terminated all the challenged policies and "nothing . . . suggest[ed] that [the policies] would be reinstated if the suit [were]

10

terminated." Doc. 634 at 25. The magistrate judge rejected what he characterized as "Plaintiffs' attempts (on the eve of trial) to again rewrite the [c]omplaint and expand the scope of this case to the provision of other medically necessary services" beyond PDN. *Id.* at 17. Adopting the magistrate judge's recommendation, the district court dismissed all remaining claims. This appeal followed.

## II.    STANDARD OF REVIEW

"We review factual findings underlying a mootness decision for clear error. We review de novo the legal issue of whether, based on the facts, a case is moot." *Stein v. Buccaneers L.P.*, 772 F.3d 698, 701 (11th Cir. 2014).

## III.    ANALYSIS

On appeal, the plaintiffs challenge the district court's dismissal of their claims in four ways. First, they argue that the district court improperly dismissed Counts 1 through 4 as moot, both because the court improperly limited the scope of the lawsuit to PDN services and because Florida might renege on its policy changes. Second, they argue that the district court erred in dismissing Count 5—the challenge to Florida's PASRR program—because the remaining plaintiffs could maintain that claim despite the fact that they were not presently institutionalized. Third, they object to the dismissal of plaintiffs A.R., A.G., and T.H. from the case on mootness or lack of standing grounds because they had

11

either moved away from Florida or turned 21. Fourth, they argue that the district court improperly denied class certification. We take up each argument in turn.

## A. Counts 1 Through 4 Are Moot Because the State Has Exempted PDN Services from the Convenience Standard.

The district court concluded that Counts 1 through 4 were moot because the State amended its administrative rule permitting application of the convenience standard to PDN services.

Article III limits the federal courts to deciding "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2, cl. 1. This limitation means that federal courts lack jurisdiction over cases where the issue in controversy has become moot. *See Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335-36 (11th Cir. 2001). A case generally "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (internal quotation marks omitted).

A case does not necessarily become moot when a defendant voluntarily ceases the activity that forms the basis of the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Rather, "voluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005). In cases where the defendant is the government, we apply a rebuttable presumption that

government actors are "unlikely to resume illegal activities." *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328-29 (11th Cir. 2004). We have explained that "[t]his presumption is particularly warranted in cases where the government repealed or amended a challenged statute or policy—often a clear indicator of unambiguous termination." *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014).

Since the plaintiffs filed suit, the State of Florida formally adopted a new administrative rule exempting PDN services from the convenience standard. *See* Fla. Admin. Code R. 59G-4.261(4). The State also has long since removed all subordinate policies that could be construed as applying pressure to parents to provide skilled nursing services to their children by deleting statements in the AHCA Handbook requiring caregivers "to participate in providing care to the fullest extent possible" and by authorizing PDN services only to "supplement" caregiver-provided care. Doc. 237 at 6-7; *see* Doc. 118-9 at 44. Those changes in Florida's regulations and policies rendered the plaintiffs' challenge moot.

The plaintiffs contend that their case is not moot because Florida continues to apply the convenience standard when deciding whether Medicaid covers PDN services. We examine three factors to determine whether there is a "reasonable expectation that the government entity will reenact the challenged legislation" such that a challenge to government conduct will not be moot: (1) whether the change

13

in conduct resulted from substantial deliberation or was only an attempt to manipulate jurisdiction; (2) whether termination of the challenged conduct was unambiguous, permanent, and complete; and (3) whether the government has consistently maintained its commitment to the legislative scheme. *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1256-57 (11th Cir. 2017) (en banc), *cert. denied sub nom. Davenport v. City of Sandy Springs*, 138 S. Ct. 1326 (2018). Here, the rule change resulted from substantial deliberation; it became final, resulted from a formal, public process, and cannot be repealed or revised without going through that same process. Fla. Stat. § 120.54(3)(d)5 ("After a rule has become effective, it may be repealed or amended only through the rulemaking procedures specified in this chapter."). The State's policy change was also unambiguous: the new administrative rule plainly states that the convenience standard "shall not be applicable when determining the medical necessity of [PDN] services." Fla. Admin. Code R. 59G-4.261(4). Further, Florida has consistently repeated its commitment to the policy change. In fact, the State stopped applying the convenience standard to deny any PDN services in 2013—three years before the rule became final. Because we see nothing to suggest that Florida "will reenact the challenged legislation," *Flanigan's Enters.*, 868 F.3d at 1257, the district court did not err in dismissing Counts 1 through 4.

14

The plaintiffs further argue that the case is not moot because the district court misconstrued the scope of the complaint. Their complaint, they say, set forth more sweeping challenges than the district court recognized when it dismissed Counts 1 through 4. Specifically, the plaintiffs contend that their complaint challenged "a constellation of deficient policies and practices" beyond PDN services. Appellant's Br. at 23.

We disagree. The language of the complaint generally and the facts alleged about each plaintiff support the district court's construction of Counts 1 through 4 as challenging only Florida's policies relating to Medicaid coverage of PDN.

The complaint expressly challenged Florida's "policies, practices, and regulations to reduce [PDN] services." Doc. 62 at ¶ 19. The complaint took issue with four Florida policies that allegedly reduced PDN services: (1) the convenience standard, by which Florida refused to reimburse PDN services provided solely for the child's, parents', or caregivers' convenience; (2) a policy prescribing that "[a] recipient who is medically able to attend a [PPEC] center and whose needs can be met by the PPEC shall be provided with PPEC services instead of [PDN] services," Handbook at 2-22; (3) a policy that PDN services would be "decreased over time as parents and caregivers are taught skills to care for their child and are capable of safely providing that care or as the child's condition improves," Handbook at 2-23; and (4) Florida's PASRR screenings, by which

15

Florida determined whether PDN services were medically necessary for the plaintiffs.  Each of these policies specifically concerned Florida's coverage of PDN services, not a broader cluster of Medicaid or community-based services, for children.  And each of these PDN policies was subject, at the time the suit was filed, to Florida's requirement that Medicaid coverage was available only for medically necessary services, a determination that Florida made in part by applying the convenience standard.  Fla. Admin. Code. R. 59G-1.010.

The facts alleged about each plaintiff likewise support the district court's conclusion that the plaintiffs challenged only Florida policies related to Medicaid coverage of PDN services.  The complaint alleged that each child was prescribed PDN services by his or her physician, requested Medicaid coverage for PDN services, and was unlawfully denied coverage, depriving him or her of those services.  It alleged that the State applied the convenience standard to deny PDN services to medically fragile children whose parents were able to provide nursing services to their child.  In total, the complaint mentioned PDN services more than 70 times.  It failed to allege the denial of any other services.

Because Counts 1 through 4 of the complaint specifically challenged Florida's policies relating to Medicaid coverage of PDN services and Florida unambiguously changed its policies through formal rule-making to exempt PDN services from the convenience standard, prohibit prioritization of PPEC over PDN

16

services, abolish the caregiver preference, and mandate complete PASRR

screenings, the district court properly dismissed Counts 1 through 4 as moot.[5]

## B. No Institutionalized Plaintiffs Remain in the Case to Challenge the PASRR Program.

That leaves us with Count 5 of the complaint, which concerns Florida's

administration of the PASRR provisions of the NHRA in compliance with federal

law.  The district court dismissed the PASRR claim because it was brought on

behalf of children who were institutionalized, yet no plaintiff in the case remained

in an institution.

The plaintiffs concede that none of the plaintiffs who resided in nursing

institutions when the complaint was filed remains institutionalized.[6]  But they

argue that they nevertheless can challenge the PASRR program because Florida's

allegedly flawed administration of the program puts remaining plaintiffs C.V.,

M.D., and C.M. at risk of unnecessary institutionalization.  We reject this argument

because Count 5 of the complaint clearly specified that "institutionalized

---

[5] The plaintiffs also contend on appeal that the complaint challenged the definition of medical necessity found in Rule 59G-1.010(166) as applied to all Medicaid services—not merely as applied to PDN services.  That is not how we read the complaint.  The complaint mentioned the definition of medical necessity only three times.  Only once did the complaint challenge the definition of medical necessity, condemning the application of the convenience standard to PDN services specifically.  On its face, then, the complaint plainly challenged the application of the definition of medical necessity as applied to PDN services only.

[6] A.G., L.J., and T.H. resided in nursing facilities at the time the complaint was filed.  L.J. has since died.  A.G. and T.H. were released from nursing facilities in 2013.

17

Plaintiffs" challenged the State's administration of the PASRR program and that only "institutionalized Plaintiffs and members of the sub-class of institutionalized Plaintiffs" were harmed by it. Doc 62 at ¶¶ 329, 335. Count 5 did not allege any claims on behalf of non-institutionalized children who might be at risk of being institutionalized.[7]

## IV.    CONCLUSION

Because Counts 1 through 4 are moot given Florida's unequivocal policy changes and because no institutionalized plaintiff remains in the case to bring Count 5, the district court correctly dismissed the case in its entirety.[8] We affirm the district court's dismissal.

**AFFIRMED.**

---

[7] On appeal, the plaintiffs also argue that the district court erred in dismissing A.G., T.H., and A.R. from the case. We disagree. Having turned 21, A.G. and T.H. would never again be subject to PASRR screenings through the Children's Multidisciplinary Assessment Team within the Florida Department of Health—a team that only administers such screenings to children. *See* Doc. 62 at ¶¶ 95-96 (challenging PASRR screenings conducted by the Florida's Children's Multidisciplinary Assessment team, which exclusively "makes recommendations for medically necessary services for children from birth to twenty-one"). And having moved to Colorado in 2015, A.R. was no longer subject to allegedly improper PASRR screenings from the Florida Department of Health. Because A.G., T.H., and A.R. "lack a legally cognizable interest in the outcome" of this dispute, the district court did not err in dismissing them from the case. *BankWest, Inc. v. Baker*, 446 F.3d 1358, 1364 (11th Cir. 2006) (internal quotation marks omitted).

[8] Because all of the plaintiffs' claims are moot, we need not consider whether the district court properly denied class certification.